IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

STEPHEN UNDERWOOD,

    Plaintiff,

v.                                                   No. 04-2473 B

THE CITY OF MEMPHIS, et al.

    Defendants.

_____

ORDER GRANTING IN PART AND DENTING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
_____

Plaintiff Stephen Underwood brought this action against the Defendants Shelby County, Pamela Kirby, and Pizzaro Wesley asserting, pursuant to 42 U.S.C. § 1983, violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution arising from his alleged detention at the Shelby County jail on June 27, 2003.[1] In addition, Underwood asserts a cause of action under Tennessee state law for intentional infliction of emotional distress. Before the Court is the motion of the Defendants for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the motion of the Defendants is GRANTED in part and DENIED in part.

STANDARD OF REVIEW

Rule 56( c) provides that a

judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to

---

[1] Plaintiff initially also named the City of Memphis as a Defendant in this action. However, the City was dismissed pursuant to a stipulation of dismissal entered on February 3, 2006.

> interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

FACTS

The following facts are undisputed unless noted.[2]  Defendant Shelby County owns and operates a jail located at 201 Poplar Avenue in Memphis, Tennessee. (Aff. Stephen Underwood ("Underwood Aff.") ¶ 3.)  The jail includes an intake section referred to as the Law Enforcement Lobby ("Lobby"), where law enforcement officers bring arrested persons for booking and processing. (Aff. James E. Coleman ("Coleman Aff.") at ¶ 3.)  After processing, prisoners are moved from the Lobby to transfer cells to await transfer to the jail.  (Aff. Pizarro Wesley ("Wesley Aff.") at ¶ 4.)  If the transfer cells are full, the prisoner must wait in the Lobby until one becomes available. (Wesley Aff. at ¶ 4.)  Shelby County has specific rules and regulations for the processing of inmates in the intake area of the jail.  (Coleman Aff. at ¶ 4; Pl.'s Resp. Mot. Summ. J. ("Pl.'s Resp.") Ex. 16, 17, 18.)  An officer bringing an arrestee for booking must enter through the sally port, disarm, and escort the arrestee into the intake area through two locked doors.   (Pl.'s Resp. Ex. 17 at 2.) Entrance into the Lobby is controlled by jail personnel in a nearby control room. (Dep. Gyton Moore ("Moore Dep.") at 11-12.)  Upon arriving at the locked entrance, the escorting officer must press a button and confirm his or her identity with jail personnel before admission is granted. (Moore Dep. at 12-14.)  There are two exit doors from the Lobby.  (Moore Dep. at 12.)  One of these doors leads to the sally port, while the other leads to a waiting area for civilians.  ( Moore Dep. at 12-13, 16-17.)  Both doors are locked and controlled by the personnel in the control room.  (Moore Dep. at 13, 17.)

Underwood has been a Police Officer with the City of Memphis since 1996. (Underwood

---

[2] The Defendants cite to only seven "material" facts in support of their motion for summary judgment. (Def.'s Mot. Summ. J. Mem. Supp. Thereof ("Def.'s Mot.") at 13-14.)  The remaining facts recited herein derive from the evidence submitted by the Plaintiff and the Defendants.  Where factual disputes are evident in the submissions, they have been indicated.

Aff. ¶ 2.) On June 27, 2003 at approximately 1:30 pm Underwood arrived at the Lobby to process an arrestee. At the time Underwood arrived, there were approximately 8-10 prisoners waiting in the Lobby for processing.[3] (Underwood Aff. ¶ 4; Wesley Aff. ¶ 5.) The parties dispute whether the prisoners were being supervised at the time.[4] However, it is uncontested that they were unrestrained. Plaintiff maintains that the prisoners were speaking loudly in a manner which inhibited the processing of his arrestee and, in addition, that one prisoner was in possession of food. (Underwood Aff. ¶¶ 5, 6.) Underwood instructed the prisoners to cease their unruly behavior and, because he understood possession of food to be violative of jail policy, removed it from the inmate. (Underwood Aff. ¶ 6.) The prisoner who possessed the food became irate and signaled the attention of jail personnel behind the processing windows. (Underwood Aff. ¶ 6.) Defendant Kirby was informed of the situation and responded to the prisoner's signal. (Aff. Pamela Kirby ("Kirby Aff.") ¶ 6.)

According to the Plaintiff, after she conferred with the prisoner, Kirby aggressively informed Underwood that the jailers had given the food to the prisoners[5] and also commented that he did not "run the jail" and would need assistance if attacked by the prisoners. (Underwood Aff. ¶ 7.) Kirby asserts that Underwood walked toward her in a hostile manner, pointed a finger in her face and

---

[3] Plaintiff alleges that approximately ten prisoners were present. (Underwood Aff. ¶ 4.) In his affidavit, Defendant Wesley, who was assigned to supervise the area, maintains that there were approximately eight prisoners in the Lobby. (Wesley Aff. ¶ 5.)

[4] Defendants Wesley and Kirby were assigned to supervise the prisoners in the Lobby at the time of Underwood's arrival. (Wesley Aff. ¶ 3; Aff. Pamela Kirby ("Kirby Aff.") ¶ 3.) Wesley maintains that, while they were not physically present in the Lobby when Underwood arrived, numerous Shelby County Sheriff's Office employees were observing the prisoners from outside the Lobby. (Wesley Aff. ¶ 8.)

[5] Kirby testified that some of the prisoners present in the Lobby were provided bag lunches when they arrived for processing because it was lunchtime in the facility and prisoners who have not been processed were permitted to eat there. (Kirby Aff. ¶ 3; Wesley Aff. ¶ 10.)

informed her that he had arrest power, a statement Kirby interpreted as a threat. (Kirby Aff. ¶ 8.) Underwood maintains that Kirby made a racial comment regarding him; informed him that he could not leave the prisoner area until the Shelby County jail personnel permitted him; and stated that he would not be provided assistance in the event that the prisoners attacked him while he remained in the Lobby. (Underwood Aff. ¶ 8.)

During this exchange, Defendant Wesley entered the Lobby and stepped between Underwood and Kirby. (Wesley Aff. ¶ 10; Underwood Aff. ¶ 8; Kirby Aff. ¶ 8.) She then exited the Lobby to the control center where she phoned W.C. Powell, a Lieutenant with the East Precinct of the City of Memphis Police Department ("MPD") and Plaintiff's supervisor, regarding the situation with one of his Officers. (Kirby Aff. ¶ 9; Dep. W.C. Powell ("Powell Dep.") at 5, 15; Underwood Aff. ¶ 13.) Kirby maintains that, in accordance with Powell's instructions, she told Underwood to call his supervisor. When Underwood stated his intention not to do so at that time, she again contacted Powell and relayed Underwood's response. Thereafter she maintains that Powell directed her to "tell [Underwood] to stay in the jail until he arrived." (Kirby Aff. ¶ 9.) Powell testified in his deposition that he did not instruct Kirby to detain Underwood or otherwise prohibit him from leaving the lobby. (Powell Dep. at 15.)

Underwood claims that, at approximately 2:00 p.m., after he completed the procedures necessary to process his arrestee, he was refused exit from the Lobby despite his attempt to leave.[6]

---

[6] Kirby asserts that she "subsequently learned that the clerk operating the door to the lobby understood [her] to say that the Plaintiff could not leave the Lobby until his Lt. arrived when [she] was actually advising the Plaintiff that he *should not* leave the Jail area until his Lt. arrived." (Kirby Aff. ¶ 11.) (emphasis added) Gyton Moore, a Shelby County Jail employee who was operating the Lobby door from the control room on the date in question testified that he did not open the door upon Underwood's request because Kirby "told me to tell him that he couldn't leave just - - at the time because his lieutenant was on the way, and he wanted him to stay there until he arrived [at the Lobby]." (Moore Dep. at 20.)

(Underwood Aff. ¶ 9.) He further contends that the jail personnel responded to his requests to leave with laughter and derogatory comments and that Wesley, who remained in the Lobby, taunted and harassed him. (Underwood Aff. ¶ 9.) While in the Lobby, Underwood states that he feared for his safety and attempted to take defensive measures such as trying to get the prisoners to go into the holding cells and pulling out pepper spray. (Underwood Aff. ¶ 11.) The Plaintiff also ordered the prisoners to kneel and displayed his handcuffs. (Kirby Aff. 10; Wesley Aff. ¶ 11.) Kirby and Wesley informed Underwood in the presence of the prisoners that they did not have to go into the holding cells or kneel and also admonished the Plaintiff to put away the pepper spray. (Wesley Aff. ¶ 10; Kirby Aff. ¶ 11.) At some point while Plaintiff was in the Lobby, two Memphis Police Department Officers entered the area. Underwood attempted to leave with them but was again denied exit. (Dep. Stephen Underwood ("Underwood Dep.") at 192-97.) At approximately 3:05 p.m., the prisoners were moved out of the Lobby when a MPD officer arrived to see the Plaintiff.[7] Subsequently, at approximately 3:30 p.m., Powell, along with MPD Police Department Major Currin, came to the Lobby and Underwood was then permitted to leave.

## ANALYSIS

<u>I. Claims Pursuant to 42 U.S.C. § 1983</u>

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right

---

[7] Kirby stated that the visiting police officer was Plaintiff's "union representative." (Kirby Aff. ¶ 11.) Underwood identified the visitor as Lieutenant Sammy Williams, the President of the Memphis Police Association, who he contacted using a telephone located in the Lobby. (Underwood Dep. at 126, 135.)

secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." Humes v. Gilless, 154 F.Supp.2d 1353, 1357 (W.D. Tenn. 2001). To establish a § 1983 claim against a municipality, a plaintiff must allege that an affirmative city policy or policy of inaction was the "moving force" behind the constitutional violation. Alexander v. Beale Street Blues Co., Inc., 108 F. Supp. 2d 934, 949 (W.D. Tenn. 1999) (citing City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). A plaintiff must also allege deliberate indifference by the county through a "showing of a history of widespread abuse that has been ignored by the [County]." Berry v. City of Detroit, 25 F.3d 1342, 1354 (6th Cir. 1994). In the instant action, Underwood asserts claims pursuant to Section 1983 for violation of his rights under both the Fourth and Fourth Amendments to the United States Constitution.

### *A. Fourteenth Amendment Claim*

The Defendants first maintain that Plaintiff's Fourteenth Amendment claim must be dismissed because the Fourth Amendment specifically provides constitutional protection against the type of conduct about which Underwood complains. The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. These protections apply equally to civil and criminal cases. Daughenbaugh v. City of Tiffin, 150 F.3d 594, 598 (6th Cir. 1998). The United States Supreme Court has held that "when government behavior is governed by a specific constitutional amendment, due process analysis is inappropriate." Berg v. County of Allegheny, 219 F.3d 261, 268-69 (3d Cir. 2000), cert.

7

denied, 531 U.S. 1072, 121 S.Ct. 762, 148 L.Ed.2d 664 (2001) (citing County of Sacramento v. Lewis, 523 U.S. 833, 842-43, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)) (internal citations omitted). Generally, claims of unlawful seizure or excessive force by state officials are analyzed under the Fourth Amendment. See Alexander, 108 F. Supp. at 940-41 (analyzing a claim of seizure under the Fourth Amendment instead of the Fourteenth Amendment). To the extent Plaintiff is invoking Fourteenth Amendment protection against an unreasonable seizure, that claim is more appropriately analyzed under the Fourth Amendment. See Id. Likewise, with respect to Shelby County, Underwood's allegations of failure to train, supervise, and discipline as related to the unlawful seizure is properly considered under the Fourth Amendment. See Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (analyzing under the Fourth Amendment a failure to train and supervise claim based on an officer's unlawful acts committed in the course of an arrest). Thus, the Court DISMISSES Plaintiff's claim under the Fourteenth Amendment of the United States Constitution.

*B. Fourth Amendment Claim*

Underwood claims that he was unconstitutionally detained in violation of the Fourth Amendment when he was denied exit from the Lobby during the period of approximately 2:00 pm through 3:30 pm on June 27, 2003. "The Fourth Amendment is implicated when an individual's freedom to leave is restricted." Thacker v. City of Columbus, 328 F.3d 244, 257 (6th Cir. 2003). In order to prevail on a § 1983 claim based on unlawful seizure, a plaintiff must demonstrate both that he was seized and that the seizure was unreasonable. Id. "[A] seizure occurs when there is an unreasonable governmental termination of freedom of movement through means intentionally applied." Johnson v. City of Detroit, 944 F.Supp. 586, 593 (E.D. Mich. 1996) (citing Brower v. County of Inyo, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381-82, 103 L.Ed.2d 628 (1989) and Terry v.

Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878-79, 20 L.Ed.2d 889 (1968)). The uncontroverted evidence demonstrates that the Defendants intentionally restricted Underwood's freedom to leave the Lobby. (Underwood Aff. ¶ 9; Moore Dep. at 20.) However, the parties dispute whether that detention was reasonable.

The Defendants maintain in the instant motion that they acted reasonably in carrying out an instruction by the MPD to detain Underwood until his supervisor, Powell, arrived. (Def.'s Mot. at 15.) They further contend that MPD policies require that Underwood remain in the Lobby until his arrestee was processed and placed in a holding cell, thereby implying a justification for the seizure. (Def.'s Mot. at 16-17.) Additionally, the Defendants cite testimony by Powell that he arrived at the Lobby within 20 minutes of the call from Kirby regarding the situation to argue that, because of its brevity, the period of detention pending the supervisor's arrival was not unreasonable. (Def.'s Mot. at 16; Dep. Powell at 16.)

In response, Plaintiff offers the testimony of Powell stating that he did not order Underwood to be detained.[8] (Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") at 10.) Underwood also argues

---

[8] In his deposition, Powell testified as follows:

Q: You didn't leave any instructions for [Underwood] to wait for you in the area or anything like that?
A: No.
. . .

Q: Did you instruct Sergeant Kirby to not let Officer Underwood leave the area?
A: No.

Q: Did you instruct Sergeant Kirby to detain Officer Underwood in the law enforcement Lobby?
A: No.

(Underwood Dep. at 15, 27.)

9

that, even assuming that it is the policy of MPD for officers to remain with their arrestees until they are placed in cells, there is no evidence that the policy was the basis for the detention at issue here. (Pl.'s Resp. at 11.) Finally, Underwood disputes the time line offered by the Defendants, contending instead that he was detained against his will for approximately one and one-half hours. (Underwood Aff. ¶¶ 9, 13.) Because these factual disputes bear on the reasonableness of the Defendant's actions, summary judgment is not appropriate on the Fourth Amendment claim.

### *C. Qualified Immunity*

As a defense to a § 1983 action, individual defendants may, as Kirby and Wesley have in fact done here, argue that they are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999). (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); see also Buckner v. Kilgore, 36 F.3d 536, 539 (6th Cir. 1994), reh'g and suggestion for reh'g en banc denied (Nov. 21, 1994). "[E]ven if a public officer has deprived the plaintiff of a federal right, qualified immunity will apply if an objective reasonable official would not have understood, by referencing clearly established law, that his conduct was unlawful." Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999). On the other hand, an official may be held liable for unlawful actions not objectively reasonable at the time the action occurred. Gardenhire v. Schubert, 205 F.3d 303, 311 (6th Cir. 2000), reh'g and suggestion of reh'g en banc denied (Apr. 13, 2000).

This Circuit conducts a three-step inquiry with respect to qualified immunity claims.

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003), reh'g and reh'g en banc denied (May 6, 2003) (internal quotation marks omitted). "Although the policy of this circuit is to resolve immunity questions at the earliest possible stage of the litigation, summary judgment is not appropriate if there is a genuine factual dispute relating to whether [the Defendants] committed acts that allegedly violated clearly established rights."  Dean v. Byerley, 354 F.3d 540, 557 (6th Cir. 2004) (citations and internal quotation marks omitted).

The Court has already found that, viewing the facts in the light most favorable to the plaintiff, a genuine issue of material fact exists regarding whether the Defendant's conduct was unreasonable and thus constituted a violation of Underwood's Fourth Amendment rights. Accordingly, the Defendants' motion for summary judgment based on qualified immunity is DENIED.  See Smith v. City of Detroit, 238 F.Supp.2d 896, 902 (E.D. Mich. 2003)  (holding that summary judgment on the basis of qualified immunity was not warranted where genuine issues of material fact existed regarding the reasonableness of a seizure).

### D. Claims Against Shelby County

Shelby County asserts in the instant motion that it is entitled to summary judgment on Plaintiff's claims pursuant to § 1983 against it because he has failed to demonstrate that the governmental entity is responsible for the alleged constitutional violation. (Def.'s Mot. at 18-20.)  Local governments such as the Shelby County are considered "persons" for purposes of § 1983.

Holloway v. Brush, 220 F.3d 767, 772 (6th Cir. 2000).  This does not mean, however, that municipalities are "liable for every misdeed of their employees and agents." Alkire v. Irving, 330 F.3d 802, 814-15 (6th Cir. 2003) (quoting Garner v. Memphis Police Dep't, 8 F.3d 358, 363 (6th Cir. 1993)). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. New York City Dep't of Soc. Serv., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).  Instead, the Supreme Court has held that "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Board of County Comm'rs of Bryan County,' Okla. v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) (citing Monell, 436 U.S. at 694, 98 S.Ct. at 2027); Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986); and City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989)).  The Sixth Circuit has instructed that

> [f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort.  Such a requirement ensures that a [municipality] is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the [municipality].  The "policy" requirement is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials.  Instead, the "policy" requirement is meant to distinguish those injuries for which the [municipality] is responsible under § 1983, from those injuries for which the [municipality] should not be held accountable.

Gregory v. Shelby County, Tenn., 220 F.3d 433, 441 (6th Cir. 2000) (internal citations omitted). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) (citing Monell, 436 U.S.

12

at 690-91, 98 S.Ct. at 2035-36).

> A "custom" for purposes of Monell liability must be so permanent and well settled as to constitute a custom or usage with the force of law. In turn, the notion of "law" must include deeply embedded traditional ways of carrying out state policy. It must reflect a course of action deliberately chosen from among various alternatives. In short, a "custom" is a "legal institution" not memorialized by written law.

Doe v. Claiborne County, Tenn., 103 F.3d 495, 507-08 (6th Cir. 1996) (internal quotation marks and citations omitted). A plaintiff must, in order to show a custom or policy, adduce specific facts in support of his claim. Conclusory allegations will not lie. Culberson v. Doan, 125 F.Supp.2d 252, 263-64 (S.D. Ohio 2000). The Supreme Court has consistently held that a municipality may not be held liable solely on the basis of respondeat superior. See Brown, 520 U.S. at 404, 117 S.Ct. at 1388; Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993); Collins v. City of Harker Heights, Tex., 503 U.S. 115, 121, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992); Canton, 489 U.S. at 385, 109 S.Ct. at 1203; City of St. Louis v. Praprotnik, 485 U.S. 112, 121-22, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); Pembaur, 475 U.S. at 478, 106 S.Ct. at 1297-98.

It is not enough for a § 1983 plaintiff to identify conduct attributable to a municipality. Rather,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Brown, 520 U.S. at 404, 117 S.Ct. at 1388 (emphasis in original). Thus, to recover, the Plaintiffs'

> must show that [their] civil rights were violated pursuant to and as a direct result of the [city's] official policy or custom. The burden in this regard requires a showing that the unconstitutional policy or custom existed, that the policy or custom was connected to the [city], and that the policy or custom caused [their] constitutional

13

violation.

Napier v. Madison County, Ky., 238 F.3d 739, 743 (6th Cir. 2001) (internal citations omitted).  In a case alleging failure to train officers or to investigate, a plaintiff must also establish that the municipality's failure "in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants."  See Ferguson v. Leiter, 220 F.Supp.2d 875, 884 (N.D. Ohio 2002) (quoting Canton, 489 U.S. at 389, 109 S.Ct.1197); Humes, 154 F.Supp.2d at 1363.

The basis for Shelby County's motion for summary judgment is that the Plaintiff has failed to establish the existence of a municipal policy or custom supporting liability. (Def.'s Mot. at 18-20.)  In response, Underwood maintains that Shelby County has a policy or custom of failing to control and restrain prisoners in the Lobby. (Pl.'s Resp. at 15-21.)  In support of his argument, the Plaintiff notes that unrestrained prisoners are permitted to come into contact with officers in the Lobby.  Further, he asserts evidence demonstrating that Shelby County has not adequately responded to complaints by officers of the failure of jail personnel to assistant them with the handling of unruly prisoners or to aid them during attacks. Such failures, according to the Plaintiff, evidence a failure on the part of the County to control, train and supervise jail personnel working in the Lobby.

The Court finds Plaintiff's argument unavailing.  As noted above, to establish Shelby County's liability in this action, the Plaintiff must show a direct causal link between the cited policy and the constitutional deprivation alleged.  Brown, 520 U.S. at 404, 117 S.Ct. at 1388. The constitutional violation alleged by Underwood is unlawful seizure as a result of the actions of the Shelby County jail personnel in operating the exit doors of the Lobby in a manner which restricted his freedom of movement.  In contrast, the policy cited by Underwood relates to the control and restraint of unruly prisoners in the Lobby area.  Underwood has alleged that the unruly conduct of

14

the unrestrained prisoners escalated the situation with Defendants Wesley and Kirby and, in addition, that he feared for his safety while detained in the situation because of contact with the prisoners. (Pl.'s Resp. at 18.) Even assuming that Shelby County does have a policy or custom of failing to restrain or control prisoners in the Lobby and that such a policy or custom rises to the level of a constitutional violation, Underwood has not established that the policy or custom was the "moving force" behind his unlawful detention. Brown, 520 U.S. at 404, 117 S.Ct. at 1388. Rather, it appears from the evidence submitted, that the direct cause of the unlawful restriction on Plaintiff's freedom of movement was not contact with unruly prisoners, but the conduct of Shelby County jail personnel in refusing to open the exit doors. Further, while Plaintiff has submitted evidence that Shelby County may have been indifferent to complaints regarding the control of prisoners in the Lobby, there is no evidence that it was deliberately indifferent to, or even aware of, Underwood's detention in the Lobby by jail personnel. Accordingly, Shelby County's motion for summary judgment is GRANTED.

### *E. Eighth Amendment Claim*

In the instant motion, the Defendants also argue that, to the extent that Plaintiff asserts a claim pursuant to § 1983 for violation of his rights under the Eighth Amendment, they are entitled to summary judgment because verbal threats do not rise to the level of a constitutional claim. (Def.'s Mot. at 17.) In response, Underwood concedes that he does not assert a claim for violation of his Eighth Amendment right to be free from cruel and unusual punishment on the basis of verbal harassment. (Pl.'s Resp. at 15.) Because Plaintiff does not provide any other basis for such a claim in response to the Defendant's motion and because his complaint does not state a cause of action under the Eighth Amendment, to the extent that Plaintiff asserts such a claim, it is DISMISSED.

II. State Law Claims

As a preliminary matter, the Court must address what contentions pursuant to Tennessee state law are presented in the Plaintiff's amended complaint. Paragraph 40 of that pleading clearly asserts a claim for the tort of intentional infliction of emotional distress. (Am. Compl. ¶ 40.) In response to the instant motion, Underwood maintains that the complaint also states a cause of action for negligent infliction of emotional distress, false imprisonment, and negligence. (Pl.'s Resp. at 22.) Upon a review of the complaint, particularly those paragraphs setting forth the causes of action, the Court finds no statement of claims for negligent infliction of emotional distress, false imprisonment,[9] or negligent training or supervision.[10] (Am. Compl. ¶¶ 24-46.) Because the complaint did not provide the Defendants with 'fair notice' of those claims, they will not be considered here. Jones v. Duncan, 840 F.2d 359, 361 (6th Cir. 1988) (noting that Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth a "short and plain statement of the claim" in order to put defendants on notice of the claims against them).

Plaintiff's cause of action for intentional infliction of emotional distress under Tennessee law is governed by the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn.Code Ann. 29-20-201 et seq. The § 1983 claims would ordinarily confer supplemental jurisdiction over the TGTLA claim because it arises out of the same facts and forms part of the same case or controversy. See 28

---

[9] The Amended Complaint makes references to the seizure of the Plaintiff in relation to his constitutional claims. (Am. Compl. ¶ 33.) The only mention of a state law "false imprisonment" claim arises in the Plaintiff's prayer for relief. (Am. Compl. VII (b).) However, a state law false imprisonment claim is not included in the complaint's causes of action. (Am. Compl. ¶¶ 24-46.)

[10] Plaintiff's complaint cites the failure of Shelby County to properly supervise, train, and restrain its personnel. (Am. Compl. ¶ 32) However, there is no mention of negligence. Because the alleged failure of Shelby County to train and supervise the jailers is properly encompassed by Underwood's constitutional claim, without more, the Defendant could not have been put on notice of a state law negligence claim from this assertion.

16

U.S.C. § 1367(a). However, TGTLA claims must be brought in "strict compliance" with the terms of the statute. Tenn. Code Ann. § 29-20-201(c). The TGTLA gives the state circuit courts exclusive original jurisdiction over claims brought pursuant to its provisions. Tenn. Code Ann. § 29-20-307.

A federal district court may, in its discretion, decline supplemental jurisdiction over a state law claim, even if jurisdiction would otherwise be proper under 28 U.S.C. § 1367(a). Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4).

In Gregory v. Shelby County, Tennessee, 220 F.3d 433 (6th Cir. 2000), the Sixth Circuit affirmed the district court's dismissal of the TGTLA claims, stating, "[i]n this instance, the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." Gregory, 220 F.3d at 446; see also Maxwell v. Conn, No. 89-5060, 1990 WL 2774 (6th Cir. Jan.18, 1990) (TGTLA's grant of exclusive jurisdiction to the state courts "belie[d]" plaintiff's argument that he could expect to try the TGTLA claims in the same proceeding as his federal claims); Spurlock v. Whitley, 971 F.Supp. 1166, 1185 (M.D. Tenn. 1997).

Furthermore, in Beddingfield v. City of Pulaski, 666 F.Supp. 1064 (M.D. Tenn. 1987), rev'd on other grounds, 861 F.2d 968 (6th Cir.1988), the court held that the TGTLA's exclusive grant of jurisdiction to the state circuit courts precluded the federal court's exercise of supplemental jurisdiction over TGTLA claims. The court reasoned that, when such supplemental state law claims involve neither federal law nor federal diversity jurisdiction, no Supremacy Clause interests are implicated. Therefore, federal courts would appear obligated to apply the TGTLA limitations on

17

suability as a matter of state substantive law.  See Fromuth v. Metropolitan Gov't of Nashville, 158 F.Supp.2d 787, 798 (M.D.Tenn.2001).  The Court declines to accept jurisdiction over the Plaintiff's claim for intentional infliction of emotional distress brought pursuant to Tennessee law in accordance with 28 U.S.C. § 1367(c)(4).[11]

### III. Punitive Damages

Finally, the Court turns to Shelby County's motion with respect to Plaintiff's punitive damages claim.  It has been generally held that § 1983 plaintiffs cannot recover punitive damages against a municipality.  See Jefferson v. City of Tarrant, Ala., 522 U.S. 75, 79, 118 S.Ct. 481, 485, 139 L.Ed.2d 433 (1997) (citing Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)); Chonich v. Wayne County Community Coll., 973 F.2d 1271, 1274 n.3 (6th Cir. 1992), cert. denied, 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994).  Accordingly, Plaintiff's claim for punitive damages against Shelby County is DISMISSED.[12]

### CONCLUSION

For the reasons stated herein, the motion of the Defendants is GRANTED in part and DENIED in part.  The motion is GRANTED with respect to Plaintiff's Fourteenth and any Eighth Amendment claims against all Defendants as well as Plaintiff's Fourth Amendment and punitive damages claims against Defendant Shelby County.  The motion is DENIED with respect to Plaintiff's Fourth Amendment claims against Defendants Kirby and Wesley, including their

---

[11] Because the Court has declined to exercised jurisdiction over Plaintiff's state law claim, it need not address Defendants' argument that they are entitled to "qualified/good faith" immunity under state law when carrying out discretionary functions.  (Def.'s Mot. at 21.)

[12] The Defendants' motion seeks summary judgment as to Plaintiff's punitive damages claim against only Shelby County.  Accordingly, to the extent that Plaintiff's complaint asserts claims for punitive damages against Defendants Kirby and Wesley, those claims remain.

assertions of qualified immunity.  Further, Plaintiff's state law claims are hereby DISMISSED.

**IT IS SO ORDERED** this 6th day of July, 2006.

               s/  J. DANIEL BREEN
               UNITED STATES DISTRICT JUDGE